UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,                         Case No. 12-20705
                                             Honorable Thomas L. Ludington

v.

BRUCE ALAN EDWARD,

       Defendant.
_____/

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

      Bruce Edward allegedly sold counterfeit copies of Microsoft software for his own profit. Once law enforcement officers began to suspect Edward of wrongdoing, they traveled to his home—with a search warrant—and discovered over one hundred copies of counterfeit Microsoft products along with other incriminating evidence. Two Special Agents interviewed Edward while the search warrant was executed, and he made various statements he now moves to suppress. Edward contends that his statements were involuntary and made during a custodial interrogation without the benefit of *Miranda* warnings.

      An evidentiary hearing was conducted concerning Edward's claims on October 2, 2013. The government called the only witness that testified; Edward did not testify or present evidence of any kind. Upon review of the parties' briefs and the testimony from the October 2 hearing, Edward's arguments lack merit. His motion will be denied.

I

A

      In April 2010, Microsoft Corporation Anti-Piracy investigator Steve Studhalter informed Special Agent Michael Godfrey (with the United States Department of Homeland Security) that

Edward was selling counterfeit copies of Microsoft products on eBay.com. The allegation came after Edward had three shipments of counterfeit software seized by Customs and Border Protection on March 26, 2009; January 9, 2010; and February 5, 2010. Each incident involved orders of counterfeit software shipped from China to Edward's Atlanta, Michigan home, and each time Edward was sent a related seizure notice. Substantiating Studhalter's information, on December 22, 2009, Microsoft purchased five counterfeit copies of "Microsoft Office Pro 2003" from Edward through eBay.

On April 27, 2010, after receiving the tip, Special Agent Godfrey also made an undercover purchase from Edward through eBay. The transaction involved three counterfeit copies of "Microsoft Office 2003 Professional Full Pro Version New." Microsoft sent a "cease and desist" letter to Edward on August 24, 2010. Then, on September 3, 2010, Special Agent Godfrey made another undercover purchase—again from Edward through eBay—for two counterfeit units of "Microsoft Office 2003 Professional Full Pro Version New."

On September 16, 2010, a federal search warrant was executed at Edward's residence located at 11881 Reimann Road in Atlanta, Michigan. Five United States Immigration and Customs Enforcement (ICE) agents, along with one local uniformed police officer and one Microsoft product expert, approached Edward's residence just before 9:00 a.m. Approximately three minutes after the officers knocked, Edward opened the front door. The officers informed Edward they had a search warrant authorizing the search of his residence for evidence relating to the distribution of counterfeit software. The subsequent search uncovered 111 copies of Microsoft software, software sleeves, receipts from the United States Postal Service, and a copy of the August 24, 2010 "cease and desist" letter.

**B**

After an initial sweep of the house for officer safety, the search began. Edward agreed to be interviewed by Special Agents Godfrey and Thomas Miller while the search was carried out. The subsequent interview took place in Edward's kitchen area; he was seated in a chair directly before the glass door leading to his backyard. Special Agents Godfrey and Miller sat five to six feet away, in Edward's kitchen, so that Edward was the closest to the door. During the interview, the other ICE agents, along with the Microsoft expert, conducted the search of the other parts of the home.[1]

The government alleges that "[w]hen the agents first entered [Edward's] house and then again at the outset of the interview, the agents explained to [Edward] that he was free to leave and that he was not under arrest." Pl.'s Resp. 3, ECF No. 24. The government further alleges as follows:

> About half-way through the interview, Agent Godfrey informed [Edward] again that he was free to leave and did not have to answer any questions. Every time [Edward] agreed to continue the interview. . . . The agents also told him he was free to get himself something to drink if he wanted, that he could take breaks as needed, and use the restroom[.]

*Id*. at 3–4. The agents wore bullet proof vests and ICE jackets, and although they were both armed, they never drew their guns. Edward was not arrested at the conclusion of the interview and the related search of his home, nor was he restrained in any way. The government contends that "[t]he atmosphere during the interview was calm, cordial, non-threatening and non-accusatory. There was no display of aggressive behavior, no yelling. The agents were polite and did not make any threats or promises. [Edward] was calm, cooperative, emotionally consistent, and did not appear stressed." *Id*. at 4. After approximately one hour, the interview concluded

---

[1] The government indicates that the uniformed police officer was only present for a few minutes at the beginning of the execution of the search warrant "per standard procedure." Pl.'s Resp. 3 n.1.

and the officers left Edward's home. During the interview, however, he "made several admissions and incriminating statements." *Id*.

## C

On October 24, 2012, Edward was charged by indictment with five counts of willful infringement of copyright and one count of mail fraud. *See* Indictment 2–6, ECF No. 3. On July 25, 2013, Edward filed the pending motion to suppress. He argues that any statements he made during the September 16, 2010 interview should be suppressed "because they were made while [Edward] was in custody, without waiver of rights under *Miranda v. Arizona*, and in response to interrogation or to statements by a government agent that were reasonably likely to elicit an incriminating response," Def.'s Mot. 2, ECF No. 20, and "because they were not voluntary in light of the totality of the circumstances[,]" *id*.

The Court conducted an evidentiary hearing concerning the suppression of Edward's statements on October 2, 2013. Special Agent Godfrey was the only witness; he was called by the government and then cross-examined by Edward's attorney. Edward offered no evidence. Godfrey testified that Edward was informed on multiple occasions—when the officers first arrived, at the outset of the interview, and then again about halfway through—that he did not have to answer any questions and was free to leave. He indicated that Edward was calm during the interview and was not restrained in any way. Special Agent Godfrey recalled that Edward used the bathroom during the interview and even exited the home through the backdoor, unaccompanied, to care for his cat (which was outside at the time). According to Godfrey, the interview lasted for less than an hour, after which the officers left Edward's home.

## II

At the outset, which party carries the burden of persuasion must be addressed. In his motion, Edward indicates that "[t]he burden is on the prosecution, the proponent of the statements, to show to this Court the statements have been obtained without violation of constitutional rights of [Edward] and in a manner so as to ensure the voluntary nature of the statements." Def.'s Mot. 4 (citing *Rhode Island v. Innis*, 446 U.S. 291 (1980)). The government slices the issue more delicately, and indicates that "*Miranda* warnings must be given only when a suspect is both in custody and subject to government interrogation." Pl.'s Resp. 5 (citing *Illinois v. Perkins*, 496 U.S. 292, 297 (1990)). Accordingly, it contends that Edward has "the burden of proof on the issue of custody because [he is] seeking to suppress evidence." Pl.'s Resp. 5 (citing *United States v. Smith*, 783 F.2d 648, 650 (6th Cir. 1986)).

In fact, both parties are correct. As noted by the Sixth Circuit in *Smith*, "[t]he burden of production and persuasion rests on the person seeking to suppress evidence." *Smith*, 783 F.2d at 650. Accordingly, Edward must show by a preponderance of the evidence, *see United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) ("the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."), that he was entitled to *Miranda* warnings; "*i.e.*, that he was subjected to a 'custodial interrogation.'" *United States v. Lawrence*, 892 F.2d 80, at *5 (6th Cir. 1989) (*per curiam*) (quoting *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984)). If Edward succeeds in showing that he was subjected to custodial interrogation, and therefore *Miranda* warnings were constitutionally required, the government will shoulder the burden of demonstrating (again, by a preponderance of the evidence), that Edward's statements were nevertheless voluntary. *Colorado v. Connelly*,

479 U.S. 157, 168 (1986); *see also United States v. Mills*, 869 F.2d 1494, at *1 (6th Cir. 1989) (*per curiam*) (citation omitted).

### III

Edward raises two distinct arguments in support of suppressing the statements he made on September 16, 2010. The first is that the statements are the result of a custodial interrogation without a formal waiver pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). The second is that his statements were not voluntary. Both issues are addressed below.

### A

#### 1

*Miranda* warnings are required "only when the defendant was in custody *and* was subject to interrogation." *United States v. Hendricks*, 116 F. App'x 684, 687 (6th Cir. 2004) (emphasis in original). Interrogation is defined as "express questioning or its functional equivalent." *Innis*, 446 U.S. at 300–01. The government does not deny that Edward was subjected to "express questioning," and there is little doubt that he was.

Accordingly, whether *Miranda* warnings were required turns on whether Edward was in custody at the time of the interrogation. In determining whether a defendant is in custody for purposes of *Miranda*, a court "must examine 'all of the circumstances surrounding the interrogation' and determine 'how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.'" *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004) (quoting *Stansbury v. California*, 511 U.S. 318, 322, 325 (1994) (*per curiam*)). The ultimate inquiry is whether "the law enforcement officers restrained the suspect's freedom of movement to the degree associated with a formal arrest." *United States v. Tummins*, 517 F. App'x 342, 344 (6th Cir. 2013) (citations omitted).

Courts in the Sixth Circuit are to consider the following factors when determining whether an interrogation was of a custodial nature: "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010) (collecting cases). Notably, "*Miranda* warnings are not required simply because the questioned person is one whom the police suspect." *United States v. Mahan*, 190 F.3d 416, 421–22 (6th Cir. 1999) (internal quotation marks and ellipsis omitted) (quoting *United States v. Warner*, 971 F.2d 1189, 1201 (6th Cir. 1992)).

Assessing the previous four factors, each weighs in favor of finding that Edward was not "in custody" when he was questioned by Special Agents Godfrey and Thomas. Edward was questioned in his own home, and the Sixth Circuit "has found that such a venue generally does not present a coercive environment." *Hinojosa*, 606 F.3d at 883. Indeed, "[w]hile an interrogation in one's home is not determinative alone of the custodial inquiry, it is usually indicative of the absence of the isolation inherent in custodial interrogations." *Coomer v. Yukins*, 533 F.3d 477, 486 (6th Cir. 2008) (citing *Beckwith v. United States*, 425 U.S. 341, 346 n.7, 347 (1976)). Accordingly, this "significant" element weighs against a finding of custody. *Hinojosa*, 606 F.3d at 884; *see also United States v. Panak*, 552 F.3d 462, 467 (6th Cir. 2009); *United States v. Salvo*, 133 F.3d 943, 950–51 (6th Cir. 1998).

The length of the interview, approximately one hour, also suggests Edward was not in custody. The Sixth Circuit has consistently found interviews lasting around an hour to be non-custodial. *See Panak*, 552 F.3d at 467 (interview lasting between 45 minutes and an hour was an encounter that was not custodial); *United States v. Crossley*, 224 F.3d 847, 862 (6th Cir. 2000)

(interview lasting less than an hour was not custodial); *Mahan*, 190 F.3d at 420, 422 (interview lasting an hour-and-a-half was not custodial).

Edward was not restrained in any way during the interview, and he was seated directly next to a glass door leading to his backyard. A door Edward used to leave his home during the interview, unescorted, to care for his cat outside. These facts strongly favor a finding that the interview was non-custodial. Leaving one's home to walk outside alone would never occur in the context of a formal arrest. Thus, Edward's interview did not restrain his "freedom of movement to the degree associated with a formal arrest." *Tummins*, 517 F. App'x at 344.

Finally, twice before he was interviewed and then again half-way through the interview, Edward was told that he was free to leave at any time and did not have to answer any questions. He was also told that he was not under arrest. These facts "weigh[] against [a] claim that the interrogation was custodial." *Lawrence*, 892 F.2d at *5 (citing *United States v. Knox*, 839 F.2d 285, 292–93 (6th Cir. 1988)). "Whether an officer explicitly tells the suspect that he or she is not under arrest is an important part of the analysis of whether a suspect is in custody." *Tummins*, 517 F. App'x at 344 (citing *United States v. Swanson*, 341 F.3d 524, 530 (6th Cir.2003)); *see also Salvo*, 133 F.3d at 946 (suspect not in custody where, at the beginning of the encounter, one of the agents told the suspect that he was not under arrest, that he was free to leave at any time, and that he did not have to talk); *Yukins*, 533 F.3d at 487 (suspect not in custody because officer told the suspect that she was not under arrest and that the police would leave if asked).

**2**

Edward's attorney raised the Ninth Circuit decision *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), to support his argument that the interrogation here was custodial.[2] But this authority is both non-binding and factually distinguishable.

In *Craighead*, the court indicated that "an interrogation conducted within the home presents some analytical challenges" because when

> a reasonable person is interrogated inside his own home and is told he is "free to leave," where will he go? The library? The police station? He is already in the most constitutionally protected place on earth. To be "free" to leave is a hollow right if the one place the suspect cannot go is his own home.

*Craighead*, 539 F.3d at 1082–83. But it took more than interviewing Craighead while a search warrant was executed in his home to implicate a custodial interrogation. Notably, Craighead was "directed . . . to a storage room at the back of his house[.]" *Id*. at 1078. Two officers, at least one of whom was armed, accompanied Craighead into the storage room and then closed the door behind them. *Id*. The officer that was unquestionably armed—wearing a flak jacket—leaned "against the wall near the exit, with his back to the door." *Id*. The other officer "squatted on the ground, taking notes." *Id*. Craighead testified that he "felt that he was not free to leave because he 'would have either had to have moved Detective Englander or asked him to move.'" *Id*. at 1079 (brackets omitted). The court concluded that "Craighead's home had become a police-dominated atmosphere. Escorted to a storage room in his own home, sitting on a box, and observing an armed guard by the door, Craighead reasonably believed that there was simply nowhere for him to go." *Id*. at 1089. Importantly, it was the totality of the circumstances, not the simple fact that Craighead was interviewed in his home while a search warrant was executed, that made his interrogation a custodial one.

---

[2] Because the case had not been previously raised, the government was given three days to respond with a supplemental brief, which it did. *See* Pl.'s Supp. Br., ECF No. 26.

Likewise, the Sixth Circuit has made clear that an interview conducted in a suspect's home while a search warrant is being executed is not per se custodial. In *United States v. Jewell*, 16 F. App'x 295, 297 (6th Cir. 2001), the defendant arrived to his home while a search warrant was being executed. He entered his residence and was confined to his kitchen with an FBI agent. Then, "the agent asked Jewell if he would be willing to answers some questions and Jewell agreed. During the subsequent hour-long questioning, Jewell admitted possessing child pornography and sending and receiving child pornography through his computer." *Id*. Despite being questioned while his residence was searched, the Sixth Circuit indicated that the facts "reveal that Jewell was not in custody." *Id*. at 298. Specifically,

> Jewell was informed upon arrival at his residence that he was not under arrest and would not be placed under arrest that day. Jewell voluntarily entered the residence during the search and he admitted that the agent told him he was free to leave if he desired. He also acknowledged that the agent's actions and words were not hostile or coercive. The questioning only lasted approximately an hour. While Jewell's movements inside the residence were limited, the supervising agent testified that this action was taken for the safety of the searching officers.

*Id*.

Like the defendant in *Jewell*, Edward was told he was not under arrest. He was told he could leave at any time, and that he did not have to answer questions. He presented no evidence that the Special Agents' actions and words were hostile or coercive. The questioning lasted less than an hour, Edward was free to move about his home (at least to the bathroom), and he was free to leave the home unattended. Unlike *Craighead*, Edward was not in a small storage room with an armed guard blocking the only exit—a closed door. The facts of this case are distinctly more analogous to *Jewell*, which the Sixth Circuit held involved a non-custodial interrogation.

### 3

Based on the totality of the circumstances surrounding the September 16, 2010 interview, Edward was not in custody when he was questioned by Special Agents Godfrey and Thomas.

Edward was told that he was not under arrest and did not have to answer questions, the interview was conducted in his own home for only one hour, and he was completely unencumbered. *Miranda* warnings were not required, and Edward's statements will not be suppressed on that ground.

**B**

Edward fares no better with his claim that his statements were involuntary. "When a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary." *Mahan*, 190 F.3d at 422 (citing *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir. 1992)). The Sixth Circuit has established three requirements for a finding that a confession was involuntary due to police coercion: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *Mahan*, 190 F.3d at 422 (citing *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988)). In determining whether inculpatory statements are involuntary, this Court is to "look[] to the totality of the circumstances concerning whether a defendant's will was overborne in a particular case." *Mahan*, 190 F.3d at 422 (internal quotation marks and citation omitted).

The same facts that made Edward's interview non-custodial also render his inculpatory statements voluntary. Noted by the court in *Mahan*, relevant factors to consider when determining whether a statement was voluntary "may include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." *Id*. at 423 (citing *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)). Edward

was never placed under or threatened with arrest. Special Agents Godfrey and Thomas never brandished handguns or handcuffs, or any other items associated with force or coercion. The interview took place in Edward's own home, he was told he did not have to participate, and he was allowed to walk outside alone between questions. Moreover, the interview lasted less than an hour. The totality of the circumstances surrounding Edward's interview fall far short of the coercion required to render his statements involuntary. *See Mahan*, 190 F.3d at 423; *United States v. Gatewood*, 184 F.3d 550 (6th Cir. 1999).

IV

Accordingly, it is **ORDERED** that Edward's motion to suppress, ECF No. 20, is **DENIED**.

Dated: October 8, 2013

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 8, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS